James McDaniels vs. Amos W. Barnum. (In Chancery.) ADDISON, January, 1833

Usury avoids a contract in equity as well as at law.

When a party in a court of equity attempts to enforce an usurious contract, the usury may be set up as a defence.

But when a party applies to the Court to be relieved from an usurious contract, equity will interfere, only on his paying the sum actually due.

When usury is relied on, to avoid a contract, it must be fully proved.

To a bill of foreclosure, the answer of the defendant setting forth usury in the mortgage as a defence, is not to be taken as evidence for him, unless the plaintiff asks for a disclosure on that subject, but is only equivalent to a plea of the statute of usury

When a person has assigned a mortgage and notes payable to himself to raise money for another, and on a bill to foreclose, testifies that he was agent for the mortgagor, and that the contract on which the money was advanced was usurious, the Court will not decree that the notes and mortgage are void on his testimony alone, when it appears that he came before the master with a prepared deposition, a part of which had been written by the defendant requesting him so to testify, and when his testimony is at variance in some material parts with the testimony of another witness, although his general character is unimpeached.

This was a bill to foreclose the defendant's equity of redemption in certain premises in Vergennes and Waltham, mortgaged to secure the payment of the notes, described in the opinion of the Court.

The defendant, in his answer, admitted the execution of the notes and mortgage to one Joseph Rogers, and that they were assigned by said Rogers to the complainant, as set forth in the bill; and stated further, that said Rogers had no actual interest in the notes in question, but that said notes and mortgage were executed by the defendant, to enable the said Rogers, for the defendant, and as his agent, to raise a sum of money upon them for the defendant's use.

The defendant also, in his answer, set forth that for the said notes the said Rogers received only $3940; and that the remaining sum of $1060 was reserved by the said McDaniels, being four per cent. in addition to the legal interest on the note for $5000, till it fell due, and sixty dollars over; and that the smaller notes were given for, and amounted to the legal interest on the $5000 note, annually.

The complainant's bill contained no prayer that the defendant should disclose upon what consideration the said

Addison,
January,
1833.

McDaniels
vs.
Barnum.

notes and mortgage were executed by said Barnum, or transferred by said Rogers. Rogers executed an assignment of said mortgage and notes to the complainant for the consideration (specified in the assignment) of ten thousand five hundred dollars.

It was admitted on the trial, that the complainant had paid, on the 10th day of January, 1832, $2404,62, to redeem the mortgaged premises from prior incumbrances; and also, that the complainant had obtained judgement, in a court of law, upon two of the interest notes.

The only evidence offered by the defendant, to prove the usury alleged in his answer, was the deposition of Joseph Rogers, who transferred the notes and mortgage to the complainant by assignment.

The counsel for the complainant moved to suppress this deposition—not for the improper manner in which it had been obtained and in part drawn up by the defendant, nor for any irregularity in the manner of taking it before the master, but on the ground that Rogers, standing in the relation he did to the transaction, *was an incompetent witness.*

Rogers swore to all the facts set forth in the defendant's answer, fully; and that he communicated to McDaniels that he did not want the money for himself, but that he wished to "hire or loan it" upon these securities "for Amos W. Barnum."

Certain interrogatories were put to Rogers, which, with his answers, were as follows:

1. *Question,* Is the paper you have offered here as the substance of your testimony (from which this deposition is drawn) a copy from any other paper?

*Answer,* I first made rough minutes of my testimony, and then drew it off correctly on this paper.

2. *Ques.* Is there not a good deal more on this paper than on the former one?

*Ans.* I think there may be a third more.

3. *Ques.* Did you ever show your first sketch to Gen. Barnum?

*Ans.* I think I did.

4. *Ques.* Have you ever had in your possession any thing written by Gen. Barnum, or any other person?

*Ans.* Gen. Barnum wrote down some sketches to know

ADDISON,
January,
1833.

McDaniels
vs.
Barnum.

if I would testify so and so,—stating what he wanted me to testify to. A part of my testimony now, is copied from what he wrote down.

5. *Ques.* What has become of that paper?

*Ans.* I cannot tell what has become of it. I think I destroyed it after I made out my testimony:—perhaps not: the last time I saw it, it was at my own house.

6. *Ques.* Do you think you can charge your memory with the precise phrases and terms you made use of in making the negotiation with McDaniels?

*Ans.* I have made use of the same expressions made at the time, as near as I can recollect. I may not always recollect the exact words in every case; but have stated the sense. I am not certain whether I made use of the words *get, hire or loan* money : I intend to be understood that I wanted to get, hire or loan the money for Amos W. Barnum.

7. *Ques.* Did you not propose to White, Button or others, in Danby, or elsewhere, to sell the securities you had for the money?

*Ans.* I do not recollect that I did.

8. *Ques.* Did you not state to Mr. Waller and myself, when we examined you at my office, that you did not recollect the particular phrases you made use of in getting the money?

*Ans.* I do not recollect any question put to me on that subject, except that Mr. Bates cautianed me not to make use of any technical language. I do not recollect how I answered the question, if such an one was asked.

9. *Ques.* Did you not at first decline to talk with us (when sent for by Mr. Waller) and state the reason to be that you did not know that it would be proper to talk with the opposite party?

*Ans.* Yes, I think it likely I stated some such thing, being a little wary—not knowing what the object might be.

10. *Ques.* Was it before or after this, that you received the writing from Barnum?

*Ans.* I cannot tell.

11. *Ques.* Did not Barnum, in the presence of Robinson, at Vergennes, remonstrate with you for declining to swear to a writing which he produced?

ADDISON,
January,
1833.

McDaniels
vs.
Barnum.

*Ans.* I do not remember it.

12. *Ques.* Did you not advise McDaniels to pay the Field mortgage in order to redeem the property which was mortgaged to him ?

*Ans.* I had a good deal of conversation with McDaniels on the subject, and advised him to act according to his own feelings; but did not advise him to redeem it. He advised with me a good.deal on the subject, and I told him that was the best part of the land.

13. *Ques.* Do you know how much Mr. McDaniels paid to redeem those mortgages ?

*Ans.* I think between twenty-three and twenty-four hundred dollars.

14. *Ques.* Did you carry the money, as the agent of McDaniels, and procure the mortgage redeemed ?

*Ans.* I did.

15. *Ques.* Have you not recently put all your real and personal estate out of your hands ?

*Ans.* I have deeded. all my real estate to my son and daughter—my personal estate I have sold to my son, who is to pay the amount to another daughter.

16. *Ques.* Did not McDaniels pay the sum required to redeem said mortgage in consequenceof what Barnum told him. ?

*Ans.* Not to my knowledge.

17. *Ques.* How many times did you hear Barnum and McDaniels talk about redeeming those mortgages, or did you hear them converse on that subject at all ?

*Ans.* I heard them converse frequently about the mortgage, and about giving further security before the arrangement was made. I went to bed, and was not present when it was completed. Next morning McDaniels came to me, and said he had agreed to redeem the mortgages, and requested me to carry the money.

18. *Ques.* Did you not tell Mr. Waller and myself that you had told Barnum that it was wrong for him not to abide by the bargain he had made with McDaniels, after McDaniels had paid the money ?

*Ans.* I do not recollect.

19. *Ques.* Did you not tell McDaniels you had a right

to sell the securities you had for what you pleased, and it would not be usurious?

Jauary,
1833.

McDaniels
vs.
Barnum.

*Ans.* I do no not recollect that I did.

20. *Ques.* Have you not presented the paper which you have offered as your evidence to some persons, and enquired of them if there was any thing in it which would implicate you?

*Ans.* I have shown that paper to several persons as my testimony, but not to enquire whether it would implicate me.

21. *Ques.* Did you not show it to Gen. Barnum?

*Ans.* I did several months ago. He wanted to know what I would testify to.

22. *Ques.* Is the paper hereto annexed, purporting to be signed by you, a paper which you executed on receiving the securities to get them recorded?

*Ans.* It is.

The following is the paper alluded to:

*Danby*, 25th *November*, *A. D.* 1828.

Received of James McDaniels a mortgage deed, given to me by Amos W. Barnum of Vergennes, in Addison County, Vermont, given me the 4th November, 1828, for two hundred and fifty acres of land in Vergennes and Waltham, and four lots of land in Vergennes, with all the buildings thereon; and also the notes described in said mortgage deed, for which the said James has paid me this day; and I have made an assignment to the said James of the property, and have acknowledged the transfer, and now take it to have it recorded in Vergennes and Waltham by the Town Clerks; and if the transfer is recorded, I promise to return it to the said James McDaniels, with the deed which is now recorded and sealed to the transfer, all safe; and I will pay them for recording, and McDaniels has paid me.

JOSEPH ROGERS.

23. *Ques.* Since the day when this examination was commenced, have you been able to find the paper which you stated Barnum handed you, and from which you stated that you copied a part of your testimony?

*Ans.* I have not.

24. *Ques.* Have you not entertained apprehensions that you might be liable for damages in consequence of this transaction?

*Ans.* I never have, unless my being agent for Barnum would make me liable.

25. *Ques.* Have you not asked different persons whether you would not be liable?

*Ans.* I have asked several persons their advice whether I could be made liable as agent.

26. *Ques.* Did not this consideration influence you in putting your property out of your hands?

*Ans.* It did not.

27. *Ques.* At the time you put your property out of your hands, did you suppose your memory or capacity for doing business was impaired?

*Ans.* I am not aware but that I was as capable as ever I was.

28. *Ques.* When Mr. Waller and myself sent for you to come down here to converse on this subject, did you not call on Gen. Barnum before you came, and converse with him on this subject?

*Ans.* I did call on him: Nothing was said in Mr. Waller's letter to me on what subject he wanted to see me.—I called on Barnum, and told him I had such a letter, and enquired of him whether he thought it was on this business, and whether Waller was McDaniels' attorney.

29. *Ques. by counsel for def't.* How far were you guided in making out the statement of your own testimony by the paper which you say Barnum handed you?

*Ans.* It had no effect on my testimony.

30. *Ques.* What induced you to ask any persons, as you have stated, their advice whether you would be liable, as you have stated.

*Ans.* Several people enquired of me whether I had not been lurch'd by Barnum, or was liable to lose by this transaction.

31. *Ques.* Has not McDaniels been unceasing in his efforts to prevent your testifying in this case?

*Ans.* He has a number of times said that I had better not testify.

32. *Ques. by counsel for complainant.* Did you not ask McDaniels what he would give you if you would not testify?

*Ans.* I asked McDaniels whether, in case the Court should compel me to testify, he would indemnify me if I

refnsed. This is all the questions I asked him on that subject.—McDaniels made no answer to my inquiry.

Thomas McDaniels, the son of the complainant, made the following deposition :

" At the time when Joseph Rogers and my father, James McDaniels, made a negotiation, in which said Rogers transfered to said James McDaniels a mortgage from Amos W. Barnum, in the fall of the year 1828, Joseph Rogers came to the store of my father, where I was employed in waiting on customers ; and the said Rogers stated to the said McDaniels, that he wished to sell some notes against A. W. Barnum, secured by a mortgage. He showed the notes and mortgage, and said he wanted, or had got to raise some money. The notes and mortgage were examined by my father and by myself. My father told him, he did not know that he should want to buy them : my father told him that if he would get Willard Staples, John Vail, and Aaron Rogers, or either two of them, to sign a note with him, he, my father, would try to raise the money for him ; that he had rather have their notes, than the notes and mortgage against A. W. Barnum. Rogers said, he did not know that he could get them to sign, and proposed that he should buy the notes and mortgage. My father declined buying them at that time, and Rogers went off. Afterwards Rogers came again, and a similar conversation took place : my father still declining to purchase the notes and mortgage : and Rogers said he would sell them at a discount. My father said he did not know that he wished to buy them ; that he he did not know but it might be called usury. Rogers said it could not ; and said he had a right to sell the notes at a discount, and it would not be considered usury. Rogers was there several times, and had conversation on the subject. I was occupied a part of the time, and did not hear the whole conversation ; and cannot say that I was present when the negociation was closed. I was in the store when the money was paid, and my father and Rogers went out of the store or room where I was, so that I was not present when the money was paid to him by my father ; but I think I witnessed the assignment, and Rogers came into the store after he had received the money, and asked for a paper to wrap it up in.

*Question by the defendant's counsel.*—Do you know how much money your father paid Rogers at that time, or did your father ever tell you how much?

*Answer.*—My father never told me how much, and I never asked him.

ADDISON,
January,
1833.

McDaniels
vs.
Barnum.

*Ques.* Who did you understand the money was for?

*Ans* I did not understand it was for any person but Rogers himself."

C. C. Waller's deposition, in relation to the conversation between himself, Rogers, and Mr. Bates, as far as the facts stated by him have any bearing in the case, is as follows:

"After the commencement of the present suit, I wrote to Rogers, requesting him to come to Middlebury the next day after I wrote him. He came accordingly, and at R. B. Bates' office, in presence of Mr. Bates, I requested him to state all the facts in relation to the transfer of Barnum's mortgage to McDaniels. He seemed very unwilling to make any statement of the facts, and questioned us upon several differnt statements, as to their effect in the suit, provided they were so and so. After this, he stated that he acted in the transfer merely as Barnum's agent, and that he received for the transfer the sum of $3940, as this deponent believes. Upon the question being asked Mr. Rogers, why Barnum did not close with McDaniels, as had been agreed, before the payment of the redemption money, Mr. Rogers replied, that Barnum did wrong in that, and had rather overreached McDaniels, or words to that effect."

*Argument for complainant.*—In such a case the defendant's answer is not to be taken as evidence. 1 John. Rep. *Green* vs. *Hart*, 580; 2 John Chan. Rep. *Hart* vs. *Ten Eyck*, 62.

Four questions arise in this case.

*First.*—Supposing the transaction, as related by Rogers alone, to be usurious, will the plaintiff be decreed to recover the sum advanced and legal interest, or must he lose the whole?

*Second.*—Can Rogers be a witness?

*Third.*—Is his deposition, under all the circumstances, sufficient proof of the usury?

*Fourth.*—Does not the whole evidence, taken together, rather prove a sale than a usurious loan?

*First.*—A Court of equity is the offspring of necessity. The undeviating rules of law were thought sometimes too oppressive; the moral feelings of men required an institution to mitigate their rigor; and the great principle of this Court has always been to do what is right between par-

ties without punishing them for the weakness and errors of humanity.

Addison,
January,
1833.

McDaniels
vs.
Barnum.

There are many subjects over which Courts of equity will not exercise a jurisdiction. There are others upon which their course of action is settled by precedent and many general rules are laid down in cases not calling for their application. But we have never yet seen a decree in any given case which would shock the moral feelings of men. In short, there is nothing which these Courts have not done, nor any thing which they have refused to do to avoid such a result.

In the present case there was no meeting of the rich and poor, no negotiation for a loan. Barnum conceived a project and caused it to be executed. He gave his notes and his mortgage deed to Rogers and sent him forth into the world, to New York and elsewhere, to seek a purchaser or person to advance the money, and now seeks to consummate the transaction by throwing an entire loss upon that person.

The mind of every man must revolt at such a result, and it may be asked, will a Court of equity allow the Statute of usury to be used in such a way?

There are many cases where these Courts have not allowed a party to make a fraudulent use of a good Statute.

As when a man has taken a deed, absolute on the face of it, but, in reality, a mortgage, parol evidence is let in contrary to the Statute to prove the condition.

So where a man knowing of an unrecorded deed, takes a subsequent conveyance of the same land, the first deed holds in opposition to the Statute.

So also, upon the purchase of land by parol; where possession has been taken, the parol contract is allowed to be enforced, contrary to the provisions of the Statute.

To decree that the whole should be lost is in effect to pronounce a forfeiture, which is repugnant to the origin of these Courts and all the principles by which they profess to be governed. 4. John. Chancery, 431, *Livingston* vs. *Tompkins*.

It is an admitted rule that he who asks equity must do equity. This principle is generally applied against the

McDaniels.
vs.
Barnum.

person instituting the suit, but every reason on which the principle is founded applies to this case.

The plaintiff has the notes and mortgage all regularly executed by the defendant, who comes into Court and asks to falsify and disprove his own acts and insists upon, not mere justice and equity, but upon paying nothing at all.

*Secondly.*—These papers show upon the face of them that Barnum gave Rogers certain promissory notes for value received, and a mortgage deed to secure the payment and that Rogers sold and assigned them to McDaniels. In all this there would be no usury. But Rogers is called as a witness to alter the character of these papers, although by his own hand writing on the mortgage deed,he has assigned them and given them currency. Having put his name on the deed is he competent to impeach it? The case of *Chandler* vs. *Mason*, 2 Vt. Rep. 193, is against it, and there is an obvious impropriety in allowing a man to-day to sign a contract executed to himself, and to-morrow to swear that the contract was a fiction and himself a man of straw.

In comparing the conflicting decisions on this point in *Walton* vs. *Shelly*, 1 Term. Rep. 296, & *Jourdon* vs. *Lashbrook*, 7. Term Rep. 601, it is worthy of remark that the first case was decided by the unanimous opinion of Lord Mansfield, Ashurst, Buller and Willes. The second only by Lord Kenyon, Lawrence and Gross. Ashurst dissenting. And that the last decision turned upon the apprehension that the national revenue might suffer from the principle established in the former. Whereas, as was well observed, by the judge in *Chandler* vs. *Mason*, the decision in the case of *Walton* vs. *Shelly*, rests on the broad basis of fair deal amongst men.

*Third.*—The testimony of one witness, and that merely upon *affirmation*, is not sufficient to justify so large a forfeiture. In criminal cases affirmations are not admitted at all. Whether he paid to Barnum all the money he received is a fact in which he is deeply interested and which depends on his testimony alone—this deposition on the face of it is suspicious—McDaniel's depositioncontradicts him on the most material points. The tenor of the receipt he gave to McDaniels is repugnant to his present statement. He admits that a part of his deposition was

copied from a writing furnished him by Barnum—and it is evident his mind since the commencement of the difficulty has dwelt upon the supposition that if he was an agent merely he should escape any liability.

ADDISON,
January,
1833.

McDaniels
vs.
Barnum.

*Fourth.*—Is the transaction to be regarded as a loan or as a *purchase* of paper sent to the nearest market for sale. The Statute of usury can never be violated by a *bona fide* allowance for risque. Its object is to prevent the reception of more than six per cent when there is no actual hazard.

In this case Rogers refused to indorse the notes, and there was a hazard which McDaniels could not but fear. He has since been obliged to advance several thousand dollars to disincumber the security.

In 2d Con. Rep. *Loyd* vs. *Keach*, Judge Gould says " if the seller does not warrant or indorse the note thus transferred, the presumption is that it is a sale, and not a usurious loan." Yet in that case the maker promised to pay the whole note as well as in this. And indeed, that is a strong case in our favor, to show that this transaction may be regarded as a sale.

To constitute usury there must be a loan and a corrupt agreement for more than legal interest. Negotiable paper may be sold in the market like other property. In this case the sale was not a mere cover for another transaction. It was real and constituted the whole transaction.

That McDaniels regarded it as a sale, is obvious from the terms of the agreement, as well as the receipt which was given by Rogers at the time, and also, from his son's deposition.

*Argument for defendant.*—Rogers has no interest in the event of this suit, and this is the only true ground of objection to his admissibility ever recognized in this state. 2 Aik. 138, *Nichols* vs. *Holgate.*

The doctrine in the case of *Walton* vs. *Shelly*, has been fully overruled in England, and is not considered law there. 2 Starkie, Ev. 300, 398-9.

That doctrine never was adopted there, except in relation to negotiable paper and as among parties to such paper which was passed on the responsibility of the names

37

ADDISON,
January,
1833.

McDaniels
vs.
Barnum.

*thereon,* and this was done on principles of policy peculiar to that country.

1st, This does not apply to the case, as the paper was not negotiated by the witness, nor his liability taken or relied on.

2d, The circumstances of our country call for the adoption of no such legal policy by judicial legislation.

Rogers can *be in no event* liable to either party, and therefore none of those results can transpire which have been regretted in the *Nichols* and *Holgate* case.

The plaintiff has come into Court for a decree to enforce his mortgage, and must fail if the same be illegal and void by being usurious.

Wherever the notes cannot be enforced at law, or ejectment sustained on the mortgage, then a foreclosure cannot be enforced; though on a bill to redeem, by the mortgagor, the Court would require him to do equity by the payment of the true debt.

If the testimony of Rogers is established, the notes and mortgage are ususious and void; and this testimony is not contradicted by, or inconsistent with the testimony of Thomas McDaniels.

The usury appears by the answer, and is not disproved by the plaintiff.

WILLIAMS, *Chancellor,* delivered the opinion of the Court.

This is a bill brought by the complainant, to foreclose the equity of redemption in certain mortgaged premises. The bill charges, that the defendant, on the 4th November, 1828, executed the mortgage in question, to one Joseph Rogers, to secure the payment of certain notes executed by the defendant to Rogers, of that date, one for five thousand dollars, payable in five years from the first of May, 1829, one for four hundred and fifty dollars, payable on the first of May, 1830, and four of three hundred dollars each, payable on the first day of May, in the years 1831, '2, '3 and '4, at the bank of Vergennes. And that Rogers, for a valuable consideration, sold and assigned the notes to the complainant. The bill further charges, that the premises mortgaged were subject to the incumbrance of two prior mortgages—one to Moses Catlin, which had been

ADDISON,
January,
1833.

McDaniels
vs.
Barnum.

assigned to George Field, on which a decree of foreclosure had been obtained—the other given directly to the said Field, on which a decree of foreclosure had likewise been obtained;—that the complainant had been compelled to pay the amount of the mortgages last mentioned, amounting to $2404 62.

The defendant, by his answer, admits the giving the notes and mortgage to Rogers, but says, he employed Rogers as his agent to obtain money for him; that he executed the the notes and mortgage to enable Rogers to obtain the money and to assign the same as security therefor; that Rogers assigned the notes and mortgage to the complainant for money advanced by the complainant to Rogers; that the complainant knew that Rogers, in negotiating for said loan of money, and assigning the securities, acted as the agent of the defendant; that the contract between Rogers and the complainant was usurious and void—the complainant having reserved out of the loan one thousand and sixty dollars, and paid to Rogers three thousand nine hundred and forty dollars, and no more.

To prove this defence, the defendant relies on the testimony of Joseph Rogers, who says very explicitly, that he was employed by the defendant to raise the money; that the notes and mortgage were executed to him by Barnum to enable him to obtain money thereon; that he acted solely as the agent of the defendant; that he so declared to the complainant when he first made application to him; that in all his conversations with the complainant, he avowed himself as the agent of the defendant; that he had no interest at all in the money obtained, and that the sum stated in the answer was all he received of the complainant. Indeed he testifies directly to the fact of usury.

There appears to have been a great irregularity in taking the testimony in this case, and a palpable violation of the rules which govern proceedings in this Court. No interrogatories were settled; but the witness came before the master with a prepared deposition, and the counsel for the parties examined and re-examined him, as they would a witness who testified, *viva voce*, in Court.

The defendant does not object to the plaintiff's taking a decree for the amount he paid to redeem the mortgage of Field; but the mortgage executed to Rogers and assigned

to the complainant, he insists is void as being an usurious transaction.

The statute declares that all contracts and assurances whatever, on which more than lawful interest is reserved, taken or secured, or agreed to be reserved or taken, shall be utterly void. There can be no doubt, therefore, that where full and sufficient proof can be made of the fact, that usury avoids a contract in equity as well as at law. In the exposition of this statute, as of all others, courts of equity adopt the same rules as courts of law; yet, it has been said by an eminent Chancellor, "it does often vary in the remedies given, and in the manner of applying them." Equity never relieves against an usurious security, on the application of the person who executed it, except upon the terms of his paying what is really *bona fide* due thereon, with legal interest.—*Scott* vs. *Nesbit*, 2 Br. C. C. 641.—9 Ves. 84.—16 Ves. 124. The rules of the Court in relation to practice, are never dispensed with, to enable a defendant to defend on the ground of usury, except on his consenting to a decree for the amount actually received with the interest. It has been said, with great propriety, by a writer on this subject, in a treatise on equity, that the Court, "in many cases have a discretion, whether it will interfere or not, and may therefore prescribe the terms of its interference; yet it will never exercise this discretion in favor of a plaintiff who is a wrong-doer, seeking to render a court of equity the means of effectuating the wrong."— Fonblanque, 1 Vol. p. 22. The sum of money advanced, together with the legal interest, ought in justice to be repaid by the borrower, although the contract or security may be declared void by a statute founded wholly on principles of public policy. If there is any moral guilt in making an usurious contract, both parties are equally guilty, though it may be extenuated on either side by the particular circumstances attending the transaction. The remedy afforded by the statute must be given, upon principles applicable to all similar cases without regard to the character of the parties, the exorbitancy of the sum agreed to be given as interest, or the circumstances which may appear either in extenuation or aggravation. Any sum knowingly and designedly reserved in a contract above the legal inte-

ADDISON,
*January.*
1833.

McDaniels
*vs.*
Barnum.

rest, though ever so small, if in violation of the provisions of the statute, renders the contract void ; and it is no more than void if the sum is ever so large.

When usury is set up as a defence in a court of equity, and the object of a party is to avoid a contract entirely, and appropriate to his own use the money of another, and avoid the payment by force of the statute, it must be fully and substantially proved ; and the evidence to prove it, is not aided by the answer of a defendant unless he is particularly called on, to disclose in the bill.  The gratuitous answer of the defendant in this case, does not make his declarations evidence; but is to be regarded as only equivalent to a plea of the statute of usury.  This evidence should come from legal, competent and credible witnesses, or at least from the testimony of one unimpeached witness, who testifies under such circumstances that full credit is to be given to his testimony.  It is not sufficient barely to raise a conjecture, or a probability merely that the facts may be as contended for.  A witness may swear to a fact, whose general character is unimpeached, and yet the nature of his testimony may be such, or the other circumstances detailed in evidence may be such, as to lead to a doubt whether his testimony is entitled to credit, and makes it improper to proceed on his evidence alone.

Courts of justice have felt themselves compelled to receive testimony even from witnesses whose general character was unimpeached, upon which they could not recommend to a jury to find a verdict.  It was declared by the Court in Virginia, that the testimony of a witness, tending to fix a fraud upon himself, ought not to be regarded. *Claiborne* vs. *Parish,* 2 Wash. Rep. 148.  In relation to witnesses who have attested wills, and were afterwards called on to impeach their execution, Lord Mansfield often said, he would hear those witnesses, but would give no credit to them ; and in this he was followed by Lord Kenyon.  It will be readily acknowledged by every one, that the testimony of a witness who comes to cut down and destroy a security for money which he has either passed himself or aided others in passing, should be received with jealousy, and examined with great caution.

The witness, upon whose testimony alone the defendant

ADDISON,
January,
1833.

McDaniels
vs.
Barnum.

relies, is Joseph Rogers, the man to whom the defendant executed the notes and mortgage in question, and who assigned the same to the plaintiff. No other witness has been examined by the defendant. The complainant contends, that upon this testimony alone, taken under the circumstances disclosed in the deposition, compared with the testimony of the other witnesses, taking into consideration the part which he has acted in this business, and the nature of the facts to which he testifies, the Court would not be warranted in declaring this mortgage and these notes void.

In the first place, he appears, according to his own relation, as the friend and agent of the defendant, who received these notes and mortgage for the purpose of obtaining money for him; and there can be no doubt, that it was originally contemplated that he should raise the money at more than six per cent. interest. The giving the first interest note for four hundred and fifty dollars, shows most conclusively, that this was understood by both of them.—Now, if it can be supposed, as was urged in the argument, that it was originally designed and contrived between the defendant and witness, that the money should be obtained by stipulating to give more than legal interest, and this inducement was to be held out by the witness to his friends, to whom he was about to apply for the loan of the money, and at the same time, they intended to avoid the payment by force of the statute, it would very much detract from the character of the witness as a man of integrity, if it did not affect his credibility. The evidence, though it may lead to suspicions that such was the intention, may not warrant the inference directly that such was the fact.

If the witness in this transaction acted merely as the agent of the defendant, there was no necessity for any backwardness or reluctance in declaring all the circumsances, with which he was acquainted; and towards the plaintiff at least, from whom he obtained the money, and who was to lose entirely, the sum of about four thousand dollars, he should have shown the utmost frankness. It appears by his testimony, that, although he very readily drew off and and showed to the defendant, minutes of what he would testify to, and when he was written to by Mr. Waller, one

ADDISON,
*January,*
1833.

McDaniels
*vs.*
Barnum.

of the counsel for the complainants, requesting an inter-view, he first called on the defendant to enquire whether Mr. Waller was the attorney for the plaintiff, and whether he thought he wanted to see him on this business, yet there was not the same readiness to communicate to the com-plainant or his counsel. On being interrogated whether he did not decline to talk with the counsel of the com-plainant, and state as a reason therefor that he thought it improper to talk with the *opposite party*, he answers, "I think it likely I stated some such thing, being a little *wary*, not knowing what the object might be." Surely, there was no need of this wariness towards the complainant, who applied to the witness to assist him in making the settle-ment in relation to the lands mortgaged to Field, and em-ployed him as agent for the complainant, delivered him the money to redeem the mortgage to Field, more espe-cially as the witness says, " that he supposed the whole bu-siness was then settled—that the defendant did wrong in not closing with the complainant as he agreed, before the payment of the money," and had, as the witness says, " in that rather overreached" the complainant. These circum-stances certainly throw a shade on the fairness, if not the integrity, of the witness.

Again, there is an evident contradiction between the testimony of this witness, and the testimony of Thomas McDaniels, the son of the plaintiff. Rogers represents that he first presented himself to the complainant as the agent of the defendant, and to hire money for him; and re-peats it several times : he says, that in all his conversa-tions and negotiations with the plaintiff, he declared that he had no interest in the business—that he was agent for the defendant—that he did not know that defendant would ratify the bargain, or " bear him out," as the witness ex-pressed it—that he intended to be understood that he want-ed to get, hire, or loan the money for Amos W. Barnum. Thomas McDaniels testifies that he was present at the time Rogers applied to his father for the money—that Rogers then said he wanted to *sell* the notes and mortgage—that he had got to raise some money ; and when the plaintiff declined to buy the notes, and proposed to have Rogers procure certain persons named to sign a note with him, as

ADDISON,
January,
1833.

McDaniels
vs.
Barnum.

he should prefer to advance the money on their notes rather than on the note against Barnum—that Rogers then replied, that he did not know as he could procure those persons to sign a note, and preferred to have the plaintif *buy* the notes and mortgage. He further testifies, that at a subsequent time, Rogers again applied to the plaintiff to *buy* the notes, and offered to sell them at a discount, declaring that it would not be considered as usury. This witness further says, that he examined the notes and mortgage with his father, and he did not understand that the money was wanted for any other person but for Rogers himself.— This testimony is utterly inconsistent with the statement of Rogers, that he so repeatedly represented himself as the agent of the defendant, and in that character alone, wanted to obtain for him a loan of money from the plaintiff.— The representations of both of these witnesses on this subject, cannot be correct, nor can they be reconciled on the principle of positive and negative testimony. In corroboration of the testimony of Thomas McDaniels, is the receipt executed by Rogers on the 25th November, 1828, in which he acknowledges the receipt of "the note which the said James has paid me for this day"—thus recognizing a sale, as stated by Thomas McDaniels.

There is another circumstance, which appears from the testimony of Rogers, which casts such an imputation on it, as should induce us to pause at least before we pronounce a decree on his testimony alone. The witness came before the master as I have already said, with a prepared deposition. On being interrogated whether the paper then produced, as the substance of his testimony, was copied from any other paper, he answered, that he made rough minutes of his testimony, and then drew it off correctly on the paper produced. To another question he answers, that the paper produced, contains a third more than the former one. His first sketch, he says, he showed to the defendant. He is then inquired of, whether he ever had in his possession any thing written by the defendant or any other person; to which he answers in the following words : "General Barnum wrote down some sketches to know if I would testify so and so—stating what he wanted me to testify to : a part of my testimony now is copied from

ADDISON,
January,
1833.

McDaniels
vs.
Barnum.

what he wrote down." This paper, the witness says, he thinks he destroyed after he made out his testimony.— The last time he saw it, was at his own home. The paper which the witness produced as the substance of his deposition, and which must of course have been copied from the paper given him by defendant, he says, in answer to the 21st interrogatory, he showed to the defendant some months before, when he wanted to know what he (Rogers) would testify to. He further says that he has not been able to find the paper handed to him by defendant, and from which part of his testimony is copied, which strengthens the inference which the witness has drawn, that it was destroyed. What part of this statement or sketch, written by the defendant, is copied into his deposition, the witness does not specify : perhaps he does not recollect. It may have been the most material part of his testimony. He furnishes no means by which we can separate it from the other. And though the witness says, and probably thinks, that he was not guided in making out the statement of his testimony, by the paper handed him by the defendant, and that it had no effect on his testimony ; yet it may have had an influence which he cannot recognize. We know the danger to be apprehended from testimony created by a party in this way. By stating facts to a witness—by giving him a written statement which is afterwards destroyed, it has been the case, that a witness has thought he recollected facts which had no existence. Indeed, it would always be difficult for a witness to distinguish between facts of which he had a distinct knowledge at the time of the transaction, and those which he acquired from the statement or writing obtained from the party who made them. Without imputing any such intention to create testimony in this case, it is apparent that this circumstance throws a very great discredit on the deposition of this witness.— There can be no doubt that this deposition would have been suppressed for this cause, if a motion had been made therefor. At law, a deposition drawn up by an agent, attorney, or party interested, is to be rejected altogether.— In chancery, a deposition was suppressed because the attorney for the plaintiff had written it down in the exact

38

Addison,
January,
1833.

McDaniels
vs.
Barnum.

form in which it was taken, though it appeared that the witness had told him the facts and circumstances mentioned in it.—Ambler, 252. If a deposition of this character is to be rejected entirely as improper to be read, and because it is of dangerous tendency to admit a party to impose his own statements as evidence, it is surely improper to claim for such a deposition the credit due to the statement of a witness who testifies in the ordinary manner, without any prompting or direction by the person in interest. It is further to be remarked in this case, that the notes and mortgage were executed by the defendant to the witness, Rogers; and that Rogers has, by his deed under his hand and seal, transferred and assigned the mortgage, together with the notes, to the complainant. His testimony is now introduced to avoid them : and although the Court did not consider this as coming within the rule in the case of *Walton* vs. *Shelly*, or if it did, were not inclined, on that ground, to reject the testimony altogether, yet we do say, that although we should not be disposed to go to the extent which Lord Mansfield and Lord Kenyon are said to have expressed their determination to do, in the case of witnesses who impeach the execution of a will attested by them, yet we can with propriety adopt the language of Lord Eldon, and say that such " testimony is to be received with all the " jealousy, necessarily for the safety of mankind, attaching " to a man, who, upon his oath, asserts that to be false, " which he has, by his solemn act, attested to be true."— *Howard* vs. *Braithwaite*, 1 Ves. & Bea. 202.

From a view of the whole case, considering the situation of the witness, Rogers—the part which he states he took in this transaction—his connexion with the defendant—his wariness, and want of frankness towards the complainant— the irreconcilable difference between his testimony and that of Thomas McDaniels—the manner in which his deposition was prepared—his copying a part, which may have been all that was material, from a paper given him by the defendant—his not being able to state what has become of that paper, and not distinguishing what was copied from that paper, from the other part of his testimony ;—considering, also, that he comes to avoid by his testimony, a se-

curity which he has passed as a valid security, and which he *first offered* to sell to the plaintiff, we consider that we should be unjust to the parties, and unfaithful to ourselves as Chancellors, to pronounce a decree vacating this mortgage and these notes, and thus enable the defendant to take this sum of money from the complainant without any remuneration therefor, on the solitary deposition of this witness, unsupported by any other. And if we are to be guided by legal testimony, and not indulge in conjecture—if we are to derive our information from a source unpolluted and wholly deserving of credit, we cannot say that the facts set forth in this answer, are proved by competent and credible testimony.

The result is, that the complainant is entitled to a decree; and it must be referred to a master to ascertain the sum due to him on his mortgage.

*Bates, Waller* and *Royce*, for complainant.
*Phelps, Bell, Collamer* and *Linsley*, for defendant.